

# THE ATTORNEY GENERAL
## OF TEXAS

GERALD C. MANN
~~WILL WILSON~~
ATTORNEY GENERAL

AUSTIN 11, TEXAS

No. 3057

Interest in production from oil wells
drilled under contract submitted is an
interest in real estate within contem-
plation of Article 4725 providing life
insurance company may make loans upon
first liens secured by real estate.

June 2, 1939

Honorable Walter C. Woodward
Chairman Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. 0-865
Re: Investments of insurance
companies secured by oil
payments.

We are in receipt of your letter of May 23, 1939, requesting
our opinion upon the questions and facts hereinafter set out.

On July 26, 1938, the Board of Mineral Development of the State
of Texas entered into a contract with the G. W. Drilling Company
a corporation, providing for the drilling of oil wells on a
portion of what is known as the bed of the Big Wichita River
in Wichita County, Texas. The terms of this contract will be
discussed more fully in the course of this opinion. It is pro-
posed that this contract, and all benefits thereunder, shall be
assigned to the Murwyn Investment Company, a corporation, which
company will assume the carrying out of the contract, and in
consideration of the assignment will execute as evidence of in-
debtedness its notes secured by a lien upon the properties or
interest assigned to it. This evidence of indebtedness will
then be transferred to the Reserve Loan Life Insurance Company,
which indebtedness will be secured by a lien on the minerals or

mineral interest acquired by the Murwyn Investment Company under the above mentioned contract.

The question which you wish to have answered is, whether or not the notes secured by the interest acquired by G. W. Drilling Company under the above mentioned contract with the Board of Mineral Development are secured by real estate, and whether they are securities in which life insurance companies are authorized to invest their funds as provided in Article 4725, Revised Civil Statutes, 1925.

Article 4725, Revised Civil Statutes, 1925, provides, in part, as follows:

"A life insurance company organized under the laws of this State may invest in or loan upon the following securities, and none others, viz:

"2. It may loan any of its funds and accumulations, taking as security therefor such collateral as under the previous sub-division it may invest in. It may also make loans upon first liens upon real estate, the title to which is valid and the value of which is 40% more than the amount loaned thereon: . . ."

Thompson, in his work on Real Property, Volume I, Section 55, states that: "In this country, both by statute and common law, the term 'real estate' is generally used for the phrase 'lands, tenements, and hereditaments.'"

The instrument which has been submitted for our inspection is in the general form of a drilling contract, entered into by and between the Board of Mineral Development for the State of Texas and G. W. Drilling Company, for the drilling of oil wells in the bed of the Big Wichita River in what is known as the K.M.A. Field. The contract sets out in great detail the obligations of the contractor with reference to the proper drilling of wells, the equipment to be used, and other provisions ordinarily found in a drilling contract.

The contract then continues as follows:
"10. In the event the state desires that contractor operate all of the well drilled under this drilling contract upon the Board of Mineral Development furnishing contractor with a certified copy of a resolution of such board to the effect that the state has elected that the Contractor shall operate such wells, then contractor, obligates itself to operate the same while they are flowing at a cost of ten cents (10¢) per barrel and it further obligates itself to so operate said wells if, as and when same are standardized or placed on the pump at a cost of

twenty cents (20¢) per barrel, which said cost of operations, whether flowing or pumping shall be borne out of seventy-five per cent (75%) of the oil and gas produced, and the pipe line taking the oil is authorized to pay to contractor the sums herein stipulated.

"11. <u>State shall pay contractor</u>:

"(a)  For drilling and completing each of the wells drilled and completed in accordance with the terms and conditions hereof, <u>the sum of Sixty Thousand ($60,000.00) Dollars, such sum to be payable only out of seventy-five per cent (75%) of all the oil and gas produced, saved and marketed from the wells so drilled under the terms hereof.</u>

"(b)  For standardizing each of said wells by the placing of pumping equipment thereon, the sum of Six Thousand Five Hundred ($6,500.00) Dollars, in addition to all other sums herein provided, payable only out of seventy-five per cent (75%) of the oil and gas produced, saved and marketed from the wells drilled on the above described tracts of land.

"12.  During the terms of this contract, twenty-five per cent (25%) of the gross amount of the oil and gas produced, saved and marketed from each well drilled on the above described tracts of land shall be delivered to the credit of the State free of cost, in the pipe line to which contractor may connect said wells.

"13.  <u>Contractor shall receive and be entitled to seventy-five per cent (75%) of all the oil and gas produced, saved and marketed from each well drilled</u> on the above described tracts of land until all sums due by reasons of the provisions of this contract have been paid, and the proceeds of the sale thereof shall be applied as follows:

"(a)  First to the cost of operating said wells as hereinabove provided.  (Ten cents per barrel while flowing and twenty cents per barrel while pumping).

"(b)  To the compensation to be paid contractor for drilling and completing said wells as hereinabove provided ($60,000.00) for each well drilled and completed.

"(c)  To the cost of standardizing and equipping said wells with pumping equipment as hereinabove provided ($6,500.00) for each well equipped for pumping.

"17.  If the State at any time shall elect to do, it shall have the right to take over the operation of said well or wells and to

thereafter operate said well or wells, or in the event the State elects to sell the property subject to the terms of this drilling contract, then contractor obligates and binds itself to relinquish the operation of said well or wells to the purchaser of said property, if saidpurchaser desires to operate the same."

Sections 22 and 23 provide for assignment of the contractor's rights and obligations under the contract, whether in whole. or in part.

We understand that the wells have been drilled and completed as producers insofar as the interest securing the notes is concerned, and therefore do not consider the question of whether G. W. Drilling Company took a present vested interest in real estate when the contract was executed and prior to the drilling of a well or wells under the contract.

Article 5421c, Revised Civil Statutes, 1925, Section 8a, under whàct this contract was executed, clearly contemplates that the Board of Mineral Development may provide for the development of river beds and channels for oil and gas purposes, either by lease, drilling contract, or outright sale of the minerals in place without development requirements.

Section 8a, Subsection 2, provides as follows:

"The Board of Mineral Development is hereby authorized and it is made its duty to advertise for:

"(2) For proposals to drill said river beds and channels upon consideration involving compensation in oil and/or gas and/or money of the state whereby the state will receive a proportion of the oil and/or gas as the same is produced, or by way of advance royalties paid in money."

This department rendered an opinion May 2, 1938, addressed to the Honorable R. L. Daniel, Chairman, Board of Insurance Commissioners in which it was held that real estate within the meaning of Article 4725 includes producing oil, gas and mineral leases in the form in general use in this state; royalty interest under producing oil, gas and mineral leases; and mineral interests excepted or reserved in or conveyed by a deed or other appropriate conveyance. That oil and gas leases are conveyances of minerals in place, and the royalty interest excepted or reserved in the usual oil and gas lease in use in this state, constitutes real estate, for purposes of recordation, taxation, and are within the statute of frauds, whether payable in money or kind, is too well settled to be open to question. Sheffield vs. Hogg, 77 S.W. (2d) 1021

(Sup. Ct. 1934); Yates vs. State, 3 S.W. (2d) 114: Hager vs. Stakes, 294 S.W. 835; Lamar vs. Garner, 50 S.W. (2d) 769, and many other cases.

It does not necessarily follow, however, that the instrument now under consideration creates the same interest as the usual oil and gas leases or royalty interest, and that it works a severance of the minerals in place. On the other hand, the contract appears to clearly contemplate that title to the corpus shall remain in the state and that the contractor does not, as in the usual oil and gas lease, acquire a determinable fee in the minerals in place.

Much confusion has resulted from attempts to define the property interests created by a payment out of oil, whether in the form of an "oil payment" or an "overriding royalty", and it does not seem that all the confusion has been entirely eliminated. However, more recent expressions by the courts have more clearly defined the status of such payments.

Justice Greenwood, in Sneffield vs. Hogg, 77 S.W. (2d) 1021, points out that oil royalties, whether created by exception, reservation, or by agreement that the lessee shall yield or make payment to lessor, either in money or in kind, are real estate under our taxing statute, since they are in the nature of rents or profits. Unaccured rents are incorporeal hereditaments and not personalty and as such pass to the heirs and not to the personal representatives. Their transfer apart from the land is governed by the statute of frauds relating to sale of land. Being incorporeal hereditaments, prior to the accrual they are interests in real estate, although under a strict construction of the instrument there has not been a conveyance of the minerals in place.

In Tennat vs. Dunn (Comm. App.) (1937) 110 S.W. (2d) 53, the language of the instrument was much stronger as tending to show an intention to convey an interest in the minerals in place, but the court there stated:

"We do not agree with the conclusion expressed by the Court of Civil Appeals that the instrument under construction is a conveyance of part of the oil in place . . .

"It does not follow, however, that the instrument does not create an interest in land or that it evidences merely a debt to be paid out of oil produced . . ."

The instrument in the Tennant case was construed as giving an interest in a certain part of the oil, and the court expressly

declined to pass upon "the question whether Mrs. Dunn's interest would be an interest in land, had the assignment provided for payment to her out of the proceeds of the oil, or of a part of the value of the oil, rather than for delivery of oil." It was held that Mrs. Dunn held an interest in real estate, notwithstanding she did not take title to the minerals in place.

Section 11 (a) of the contract above quoted, standing alone, does not entitle the contractor to a certain part of the oil as in the Tennant case, but when read in connection with Section 13, the contract, as a whole, is clearly susceptible to the construction that the contractor is entitled to receive a fractional part of the oil when produced. Under this construction the holding in the Tennant case comes squarely in point.

Danciger Oil & Refining Co. vs. Christian (Galveston C.C.A. 1937) 109 S.W. (2d) 980, which was finally decided within a month prior to the Tennant case, and in which a writ of error was dismissed, would go even further. In that case Danciger rented a drilling rig from plaintiff and agreed to pay therefor $750.00 per month cash "plus $1500.00 per month payable out of one-fourth of seven-eighths of the first oil and/or gas produced, saved and sold" from the leasehold estate. Danciger also agreed that when oil or gas was produced in paying quantities it would "promptly execute and deliver to First Party appropriate conveyance or assignment of the interest in such production to which First Party may be entitled under the terms hereof."

The court held that the action was not in debt, but for specific performance of the agreement to execute a conveyance of the interest in production, which, under the terms of the agreement, was that plaintiff should be paid $1500.00 per month out of a fractional part of the oil produced, saved and sold. In granting specific performance the court necessarily found that the plaintiff had an interest in real estate. It is stated by the court:

"The payment from the production of the rig rentals, is not distinguishable, in principle, from the case where the owner of a lease assigns it upon the consideration of a sum certain to be paid him out of the oil produced and saved therefrom. Such payments are profits issuing out of the land covered by the lease. When they have accrued they become personal property; but rents and royalties or other oil payments to accrue in the future are an estate in the land from which they issue . . . The fact that the rent is to be paid in money does not make it any the less a profit issuing out of the land."

The most recent case in which the Supreme Court has refused a writ of error is Sheppard vs. Stanolind Oil & Gas Company (Austin C.C.A. 1939) 125 S.W. (2d) 643, where it was held that the gross production tax on the interest created by a provision in an oil and gas lease, that the lessor should be paid, "an additional $96,250.00 to be paid out of one-sixth of five-sixths of the first oil and gas produced", should not be taxed against the lessee. In view of the provisions of the tax statute there under consideration some of the expressions of the court were probably not necessary to the decision of the case, but they are not without significance.

The court, in referring to the opinion by Judge Greenwood in Sheffield vs. Hogg, stated:

"We have been unable to peruse the opinion, holding in mind the facts of the instant case, without concluding that the interest here involved, by whatever name it may properly be called, is an interest in real estate, an interest in production under the leases, and such an interest as imposes upon its owner the burden of the production tax under the statute we are considering. It is to be observed that the court had there under consideration several royalty clauses variously worded. The court also had in mind royalty clauses in leases not actually before it. It was the expressed purpose of the court to set at rest the question of the legal status of royalty by whatever wording granted or reserved and however payable – whether in the specific product (in oil) or in money measured by the value of the product. As we have pointed out above, there is no inherent distinction between royalty and the oil bonuses here involved, except only in the fact that the amount of the latter is limited to a fixed quantity of the production measured by its monetary value. This difference clearly could have no effect as regards its owner's interest in production."

We are of the opinion that the interest of Murwyn Investment Company in the production from wells drilled under the contract submitted is an interest in real estate, and that a life insurance company is authorized to invest its funds in evidence of indebtedness secured by a first lien upon such real estate as provided by Article 4725.

You also refer in your letter to a lease or contract executed to Centennial Oil Company by the Board of Mineral Development, but a copy or complete description of the instrument does not accompany the request. If you are unable to determine the status of that lease or contract upon the basis of this opinion we shall be glad to advise you further.

We, of course, express no opinion upon the advisability of accepting this or any other type security, that being a matter addressed primarily to the sound discretion of the Insurance Commissioner.

Yours very truly

ATTORNEY GENERAL OF TEXAS

s/ Cecil C. Cammack

By
        Cecil C. Cammack
          Assistant

CCC: FG/cg

This opinion has been considered in conference, approved, and ordered recorded.

s/ Gerald C. Mann

Gerald C. Mann
ATTORNEY GENERAL OF TEXAS